## BALLARD a. WEBSTER.

*Supreme Court, First District; Special Term, December*, 1859.

CONFLICT OF LAWS.—NEGOTIABLE PAPER.—INSOLVENT'S
DISCHARGE.

In an action against the party primarily liable upon negotiable paper—*e. g.*, against the maker of a promissory note—in which no place of payment is expressed, the right of the indorsee to recover is to be governed by the law of the place where the indorsement to him was made.

Negotiable paper is personal property, within the rule that personal property has no locality, but follows the person of its owner.

An insolvent's discharge, granted under laws of another State, by which the debtor is discharged from all debts founded on any contract made by him within that State, or to be performed within the same, is not a defence in an action in this State, by a citizen of this State, on a promissory note made in the State where the discharge was afterwards granted, but expressing no place of payment, and which, before maturity, was negotiated within this State to the plaintiff.

Trial by the court.

This was an action to recover the amount of two promissory notes, of which the following are copies:

I.—" $950.99.                                    *Boston, March* 28, 1856.

"Eleven months after date, we promise to pay to the order of *ourselves*, nine hundred and fifty dollars 99-100ths, value received.            (Signed)            Webster, Button & Call.

"(Due, March 1st.)"

Indorsed as follows: "Webster, Button & Call."

Also indorsed: "Waiving demand and notice. Whitwell, Marsh & Talbot."

II.—" $345.73.                                    *Boston, May* 1, 1856.

"Eight months after date, we promise to pay, to the order of Whitwell, Marsh & Talbot, three hundred and forty-five dollars 73-100ths, value received.        (Signed)

"(Due, Jan. 4th, 1857.)"            "Webster, Button & Call."

Indorsed as follows: "Waiving demand and notice. Whitwell, Marsh & Talbot."

The signatures of the makers of these notes were admitted to be genuine, as was also the indorsement of the makers upon the first note. The answer admits (by lack of denial) the copartnership of Webster, Button & Call, and that Francis B. Webster was one of the firm. Webster and Call, two of the defendants, only, at first, were served with the summons; subsequently, personal service was made on all the defendants, but none of the others interposed any defence.

The defence of Webster was as follows: 1. He denied that the defendants indorsed and delivered the first note to the plaintiff, and denied that plaintiff was the owner and holder of the two notes, and denied that defendants were justly indebted to him. 2. That the notes were made in Boston, in the State of Massachusetts, and that at the time of the making and delivery of the notes, the makers thereof, and the payees thereof, resided in said city of Boston; that after making the notes, and on the 25th of October, 1856, and while the notes were still owned by citizens of Massachusetts, the defendants, in due form of law, filed their petitions for the benefit of the insolvent act, before the Court of Insolvency for the County of Suffolk, which court had jurisdiction in such cases; from which court a warrant was issued, the joint and separate property of the defendants taken, and vested in assignees; that the petitioners made full surrender of all their property for the benefit of their creditors; that subsequently, in due course of lawful proceedings, the defendant Webster obtained the requisite consent of a majority in amount and number of his creditors, who had proved their claims within six months from the 6th of November, 1856, the date of his assignment; and that such further lawful proceedings were had therein, that on the 11th of August, 1857, the defendant Webster, by an order of the Court of Insolvency, was duly discharged from his joint and separate debts, which were provable under the said acts, *and which are founded on any contract made by him within the commonwealth of Massachusetts,* or to be *performed within the same,* made since the act of the legislature of that commonwealth, passed April 23, 1858, and from all his debts contracted prior to October 25, 1856.

The two notes in question were transferred by Whitwell, Marsh & Talbot, the indorsers thereon, at the city of New York, on the 21st day of October, 1856, to the firm of Lewis & Jones, in that

city, woollen-cloth importers, No. 164 Fulton-street, in payment for merchandise, and on that day credited to the account of Whitwell, Marsh & Talbot, to the amount of the notes, $1296.72.

These notes matured in the hands of Lewis & Jones, and after they were due they were sold by Lewis & Jones to the plaintiff in this action, for cash, to the full face of the paper.

The indorsement of Whitwell, Marsh & Talbot was on the paper when the notes were transferred to Lewis & Jones, and the signature and existence of the firm of Whitwell, Marsh & Talbot duly proved.

The defendant Webster then offered in evidence his discharge, duly authenticated; discharging him from "all his joint and separate debts, which have or shall be proven against his estate assigned or aforesaid, and from all his joint and separate debts which are provable under the acts of said commonwealth, and which are founded on any contract made by him within this commonwealth, or to be performed within the same, and from all debts which are provable as aforesaid, and which are founded on any contract made by him since the said acts went into operation.

*Cambrelling & Pyne*, for plaintiff.

*S. C. H. Bailey*, for defendant.

POTTER, J.—In order properly to decide this action, it becomes necessary to examine the character of the *contracts*, which attach to the two notes that are the subject-matter of the trial. These two notes are what are commonly called negotiable promissory notes. They are negotiable by the law of Massachusetts, and by the law of this State.

In this particular, the law in regard to the negotiability of notes in these States, is identical. As I understand the law merchant in regard to negotiable promissory notes, the agreement in the note is, an express undertaking from the drawer to the payee, and to every other person to whom it may be afterwards duly transferred, that the *drawer* will pay the sum specified therein to the legal holder thereof at maturity.

I think it clear that *negotiation* is the inherent purpose, property, and nature of the contract in such an instrument; and that it is implied in the contract, that, if it takes the ordinary and

natural course of negotiable paper, the drawer has stamped his approbation upon an unlimited circulation of it for such a use; and that he cannot, therefore, complain that the instrument has performed a circuit of action that he did not contemplate at the time of sending it forth. I think the conditional form of these particular contracts, in their terms, as well as in contemplation of law, is such that they become contracts, not merely between the drawer and the persons called the payees, but also that, by the law merchant, they authorize a contract to be made between the drawer and such other person or persons as the payee (so constituted the agent or attorney by the drawers for that purpose) may, by the established forms of negotiation, transfer it. The form of the obligation, as well as the settled rules of law merchant, confers power and authority from the drawer to the payee, and to every future indorsee, to transmit the title to any subsequent holder; and though subsequent indorsees may, by future negotiation and transfer, create new relations between themselves, the drawer's liability is in no way changed, except that where no place of payment is fixed in the instrument, his obligation *and duty* to seek the holder, whoever and wherever he may be, is perhaps to be regarded as a burden, also implied in the contract of the drawer. And it is one of the contingencies which the law presumes was contemplated by the maker of that form of an obligation, at the time of giving it circulation. Each subsequent indorser of such a note is to be regarded as a new drawer, and the indorsement in effect, as to him, is equivalent to the drawing of a new note; and in an action for the recovery by a subsequent indorsee against *him*, the law of the contract as between *them* would be governed by the law of the place where *that* indorsement was made. The *lex loci contractus*, in such case, would regulate the damages. But it is seen that these notes were made in Boston, in the commonwealth of Massachusetts, the one payable to the drawers' own order, the other to the order of Whitwell, Marsh & Talbot, the drawers in both notes and the payees in the latter, being, at the time of making the notes, residents of the said commonwealth. As between these *first* parties, the indorsees in the one and the payees in the other, were the action between them, it is clearly the law, that the contract must be regulated by the law of Massachusetts. So too, had the notes been made payable in the latter State, the

contract would be governed by the law of that State, whomso-
ever might be parties; and it is equally clear, that had the obli-
gations been made payable in New York, that all parties to the
paper, at the time of making it, or parties subsequently created
by indorsement, would be deemed to have taken the contract
subject to the law of New York, thus enstamped upon it, because,
in that case, such indorser and indorsee adopt the law of the con-
tract, so fixed upon its face, as a part of his agreement.

This case, it is seen, differs from either of the cases above
stated. No place of payment is fixed, in *terms*, by the contract
itself. The notes were duly negotiated before maturity, in the
city of New York, in this State, to a *bona fide* purchaser, for a
valuable consideration, and the plaintiff holds by like *bona fide*
purchase, and is entitled to all the benefit, and is subject to the
same liabilities, but no other, as his immediate indorser, or
grantor. By what law, then, is this contract to be governed?
The *general* proposition in relation to the *lex loci* is well under-
stood,—that the law of a place where a contract is made, or is to
be performed, is to govern as to the nature, validity, construc-
tion, and effect of such contract; but it is equally well settled
that the place of *performance* of a contract, if it is different from
the place where it is made, controls the *lex loci*. It becomes
necessary, therefore, to determine whether, when no place is
fixed in the contract itself, the law fixes the place of perform-
ance; or whether the parties to a contract, subsequent to the
maker, have in any case power to fix the place of performance?
The general rule is, that a contract having no specified place of
payment fixed, is payable everywhere. In the case of Fanning
*a.* Consegna, in the Court of Errors (17 *Johns.*, 518), PLATT, J.,
who delivered the opinion of the court in that case, after repeat-
ing the *general* rule above referred to, says: " But if, by the
*terms or nature of the contract*, it appears that it was to be exe-
cuted in a foreign country, * * * then the place of making the
contract becomes *immaterial*, and the obligation must be tested
by the laws of the country *where the duty was to be performed*,"
and he cites *Huberus de Conflictu Legum*, vol. 2, book 1, tit. 3.
I take it to be settled, that every maker of a *promissory note*
takes upon himself *the duty of paying it;* and if he omits to fix
upon the paper itself the place of payment, he assumes *the fur-
ther duty of seeking the lawful holder, wherever he may be*, to

Ballard *a.* Webster.

pay it. The holder is not bound to *present* his demand to a drawer. Owing to the absence of a general and uniform national bankrupt law, there is, it is true, great conflict of authority upon questions arising under the State insolvent laws of the several States, in determining the question of the *lex loci*, and it would seem as if the courts had been especially and studiously careful to avoid the expression of an opinion upon the very question that arises under this point, to wit: where was a contract *made* as between the drawer of a negotiable promissory note who resides in one State, and the *bona fide* holder, who resides in another State, and who purchased it before maturity, for a full consideration, and by what law is the contract in that case governed? If there was an entire absence of judicial decisions, I should hold that it was a part of the law of the contract, that the drawer of such a note authorized the payee, and each subsequent indorser, to transfer this contract *to any person, without limitation as to his place of residence;* and that *the duty* of the drawer is also transferred, and follows the contract, into whose hands soever, and into what locality soever, such contract may be taken and negotiated ; that this is a part of the law merchant, in regard to negotiable paper. I think it contains an implied power of attorney, which the drawer sends out upon and accompanying the paper, authorizing the transfer, and, with it, he sends his promise and duty to pay the holder, wheresoever he may be. Such a note is now, by our statute, personal property. This promise of the defendant is personal property, and the law that personal property has no locality, is an old and well-settled doctrine. Personal property is subject to the law of the country in which the owner may happen to reside.

In Sill *a.* Worsweck (1 *H. Blacks.*, 690), Lord Loughborough said : " It is a clear proposition, not only by the law of England, but of every country in the world where law has the semblance of science, that personal property has no locality. The meaning of that is, not that personal property has no visible locality, but that it is subject to that law which governs the person of the owner." It follows the law of the person ; and Pothier (*Coutum. D'Orléans*, ch. 1, § 2, tom. 10, 7, 4to ed.) says, after remarking that movables have no locality : " All things which have no locality follow the person of the owner, and are consequently governed by the law or the custom which governs his person; that

is to say, by that of the place of his *domicile*." The same doctrine has been constantly maintained in this country. Chancellor Kent says (2 *Kent's Com.*, 429, 6th ed.): "It has become a settled principle of international jurisprudence, and one founded upon a comprehensive and enlightened sense of public policy and convenience, that the disposition, succession to, and distribution of personal property, wherever situated, is governed by the law of the country of the *owner*, or intestate's domicile." (See also 4 *Cow.*, 417; 4 *Johns.*, ch. 460.)

If I am right as to the legal effect of the contract of negotiable paper, which, in many respects, differs from other written contracts, then these views are not at all in conflict with the *general* doctrine, that the place where the contract is made is to control, unless it appear from *the nature of the contract*, or from the face of it, that it was to be performed in some other place.

The case of Sherrill *a.* Hopkins (1 *Cow.*, 103), was an action upon a bond dated in this State, not negotiable; the fair presumption of law, from the *nature of the contract*, is, that it was to be paid in this State, because negotiability is *no part of its nature*.

*The nature of negotiable paper*, we think, is different. The contract in these notes, as between drawer and holder, was made in this State, because the maker so authorized it to be made. The drawer authorized his payee or indorser, as his attorney, to make another contract with whomsoever he pleased, unlimited as to person or place. " *Qui facit per alium facit per se.*"

But if we are wrong in this view of the case, even the law of Massachusetts would not aid the defendant, had it been prosecuted in that State. Conceding the fact to be, as we have found it, to wit, that the plaintiff is a citizen of the State of New York, and is the *bona fide* owner and holder of these demands, upon which this action is brought, at the time of the defendant Webster's petition, assignment, and discharge; such discharge is invalid as a defence to this action. The case of Ogden *a.* Saunders (12 *Wheat.*, 533), lays down this doctrine clearly. But the case of Savoye and others *a.* Marsh and others (10 *Met.*, 594), is not distinguishable, and is in all respects, fairly this case : That was a promissory note, dated at Boston, Mass., payable to the order of Marsh & Co., who indorsed it, to the plaintiffs, citizens of New York, before maturity. The defendants were discharged

under the same insolvent law of Massachusetts, that is set up in this case. The plaintiffs, citizens of this State, brought their action in the court of Massachusetts, upon the note. The defendants set up their discharge. The court of that State held, that their State laws could only operate upon those who are *citizens of the State in which the insolvent law is enacted.* The note in that case, as in this, was not, in terms, made payable at any particular place. In the case of Scribner *a.* Fisher (2 *Gray*), a majority of the court held, that if a contract, *in its terms,* was made payable in Massachusetts, although the holder was a citizen of another State, that an insolvent discharge, obtained in that State, would be valid,—METCALF, J., however, dissenting, holding that, even in such a case, their laws extended only to their own citizens. Upon a view of all the authority to which I have had access, I think the principle to be deduced from the best-considered cases is, that the discharge of the defendant in this case is not a valid defence.